Counsel, are we going to address each defendant separately, or are you going to do a global argument? No, Your Honors, the procedure here is I will address the three issues raised in Lori Carey's brief and in Alex Loglia's brief globally, and I anticipate that that would take, as I told the Clerk of Court, 15 to 17 minutes. Ms. Rasmussen is then going to address the issues raised in Robert Carey's brief, the search issue and the sentencing issues. In three minutes? Three to five minutes, so I'll try to air it to give her five. Please proceed. May it please the Court, Counsel, Lori Carey, Alex Loglia, and Robert Carey. Robert Carey, Michael Kennedy speaking on the consolidated appellants. The first issue in this case raises this precise issue. Does a prosecutor who has a status as a Bivens defendant to my client and Ms. Rasmussen's client, who has been denied qualified immunity on the basis of planning all phases of the raid, who appeals that under the favorable standard to the Ninth Circuit, the issue of qualified immunity, then dismisses his appeal, and then three weeks later, for the very first time, seeks indictments against the people who have sued him? Is that a conflict of interest or the appearance of a conflict of interest? And I say yes. The Young v. Vuitton case What was the basis for the qualified immunity? I mean, we don't, we don't, or the denial, because if the allegations were he was investigating, you know, there's case law that says a prosecutor doesn't get qualified immunity if he's working as an investigator. So was it something more than that, or was it on that basis? Yes. In planning the raid, in the Freedom of Information Act documents that we received, the AUSA says you will clear outbuildings not named in the search warrant. But he says he's not the AUSA. Isn't that right? That is not in the record at the time that the decision was made, and recently, Judge Ezra ruled that because, has denied the renewed motion for summary judgment, because there's been no discovery on that issue. The plaintiffs, they, after, after coming to this court on appeal and voluntarily dismissing his appeal, in connection with seeking the indictments for the very first time, then they sought an emergency stay in the civil case precluding discovery in that case, which was there throughout the 48-day trial in 2007 that I participated in that had no convictions and only acquittals. So is there evidence of his misconduct, or is that the only connection that there's a reference to the AUSA and his involvement in, in the search? No. Mr. Carey's original lawyer met with Mr. Carey and had a conversation, and part of those notes were the evidence that Judge Ezra relied on recently in saying that would be flushed out in discovery, that Mr. Dam was part of the planning of that raid. But is that, that planning is, is not unlawful. So, so there has to be something else. The unlawfulness is what was, Lori Carey was inside her home. You're saying the way they, I understand, the way you, they implemented the search. There was direction given. She was claiming it was excessive force. Well, there was direction given to clear a home not in the search warrant, enter that home with automatic weapons, pull people out of the house, including my client, stand them there for five hours, throw a grenade into a home that was not in the search warrant, causing damage within that home, and executing the search warrant in a place where it is not within the search warrant with that investigative advice. So advice given by a prosecutor outside drafting the search warrant affidavit, that's not protected. And both Judge Proe and Judge Ezra have rejected attempts by the prosecutor to dismiss that claim short of trial. And so trial will be that once a conflict of interest is established, it is structural error to proceed. And incidentally, in the Young case, there were two grounds. But that was a different, that was really a different circumstance. I mean, there the conflict of interest was outside of the, you know, the suit. I mean, obviously, the concern in the Kemper case is if a defendant can disqualify the prosecutor by merely suing them, then every prosecutor will be disqualified. So I mean, that's why there seems like there's a higher standard. How do we resolve that concern? What makes this different than Kemper? Qualified immunity has, it's after the denial of qualified immunity, after the appeal to the Ninth Circuit, and then walking away from that. And the actual prosecutor in the Young case was a defendant, and the Supreme Court discussed that. But the prosecutor in the Young case had been the lawyer for the individual who got the injunction. So this is somewhat different than this case. Well, Your Honor, there were two bases, and that's, and I can quote the Young case to you. But he was, he had a conflict of interest because you can't serve two masters. He couldn't serve his client, Vu Thanh, plus serve the public interest to be a prosecutor. But the Court also noticed that he was a defendant in a civil defamation suit, just like Mr. Dam is in this case, and said that would be a conflict of interest as well. And I can get to that part of the Young case as quickly as I can. I believe it's at yes, it's at, it says, in addition, in addition, Banton, who was the lawyer, was a defendant in a defamation action filed by Klimek arising out of Banton's involvement in the litigation resulting in the induction, whose in violation was at issue in this case. This created the possibility that the investigation of Klimek might be shaped in part by the desire to obtain information useful in the defense of his personal defamation suit. That's what happened here with respect to George Rodriguez. In the criminal case, George Rodriguez, Bivens' case would go away in return for favorable treatment. And Mr. Dam met with him and discussed the Bivens' action in an entire MOI during the investigation, doing discovery in a manner that the Supreme Court found in Young. But counsel, isn't it true that Mr. Dam did not really make the ultimate decisions regarding these indictments, that they had to be approved in D.C.? Mr. Dam and Mr. Halper, the two defendants, sought and obtained seven different indictments. Those were the only two individuals that ever appeared in front of the grand jury. No other. My question was whether or not Mr. Dam had to get approval from the higher-ups in D.C. I thought the record reflected that they did not have the ultimate determination as to whether these indictments went forward, but they had to get approval from D.C. The only thing that I know, Your Honor, to answer the question directly is there was something submitted in camera that we filed a motion to see, and that was denied. So I can't speak to what was filed under seal. I know that there was a claim made to the Office of Professional Responsibility. We quoted that in the brief. And what came back was, we're not going to act until the judge rules. And so what happened is that we have structural error here in that Mr. Dam clearly has a conflict of interest in this case, and clearly has the potential for money damages from my client, and stated so a mere five months after we just got done with a trial where there were zero convictions out of 162 counts. And he stated his own perception of his interest when he said, it's personal. You threaten my job and my pension, Bill. Now, assuming that we would follow the Kemper rule, and I understand you're suggesting that the Kemper rule was abrogated by Young, if we don't. But if we followed the Kemper rule and say there has to be clear evidence of misconduct, and there has to be prejudice, how would that apply here? Would that be applicable? It wouldn't be applicable on the first basis, because Kempler and Held, the issue was raised for the first time on appeal. So what the Court of Appeals said was, you're raising it for the first time, it's waived. But if you're going to raise it for the first time on appeal, the plain air standard applies, where you have to show prejudice, i.e. misconduct. Here we raised it from the get-go, Sodom and Damas, and... So you're saying that, from your perspective, misconduct is the same as prejudice? Why is that? In terms of the actual trial, yes, I'm saying that misconduct would equal prejudice. Because in terms of the Young case, they're looking at the appearance of fairness, the appearance of a conflict of interest. And so that involves all of the decisions that are made outside of the record, as the Young case points out. But Young was sort of — I guess what I'm struggling with, Young was a structural conflict of interest. Here, it's the defendant suing the prosecutor. I mean, a defendant can always sue the prosecutor. Correct. And so if that always creates a conflict of interest, that's not going to work. And that has never been our argument. The government's tried to recharacterize that. But we said, once qualified immunity is sought and denied, then once the defendant But why is that? Because I'm not sure why qualified immunity is the threshold. Because if the qualified immunity is denied because the prosecutor was acting as an investigator or as an administrator or whatever it is, I don't see why that proves anything. Well, because it — it, by definition, shows from that point forward there's a conflict of interest. He is now a litigant subject to the same sort of things that any litigant would be. And let's assume Lori Carey or Bobby Carey had sued Greg Dam outside of this event, and he wanted then to become the prosecutor. He'd have a conflict of interest. Right. But when the defendant — So that's why the qualified immunity is important. But that wasn't the case here. Here, the defendant, in the suit, sued the prosecutor related to the investigation that led up to the criminal indictment. True. But here, the first investigative report was filed 11 months after the Bivens case was filed. Lori Carey was not a target of the investigation. Alex Loglia was not a target of the investigation. They then, after the Bivens claims are made, 18 months later, finally find themselves indicted. But that's not unusual for investigations to continue and for additional people to be added to the indictment as more information is uncovered. There's nothing sinister about that. It is in the normal case. But when you have an interested prosecutor doing that during that time, that's the conflict of interest. And that's the conflict of interest that we want to have a justice system that has a disinterested prosecutors. Disinterested prosecutors do not have an ax to grind. And they are not defendants after their qualified immunity has been — But we also need a justice system where prosecutors cannot be preempted simply by the filing of a lawsuit against that prosecutor in conjunction with a search that preceded the bringing of charges. And so not just for this case. I mean, whatever ruling we make won't apply just to this case. But it will set up the probability that if someone has a prosecutor they don't want in the case, all you do is file a Bivens action against them and they're off the case. Agreed. And so in this case, it would be on its unique facts, A, the denial of immunity, qualified immunity, at that stage, B, the dismissal of your appeal to the Ninth Circuit, walking away from that, accepting that judgment, and then turning around three weeks later and indicting. So any time a prosecutor gave advice for the investigation, the allegation can be made, a plausible allegation can be made, that he was acting as an investigator and that will survive qualified immunity. So I don't see how that rule helps. If it is advice that you search a home outside of the search warrant, which is unconstitutional, if you It just has to be a plausible allegation, correct, in order to survive a motion to dismiss? And it was very simple, if there was nothing to it, for Mr. Dam to go through the qualified immunity process, appeal it to this Court. He didn't choose that route. He chose two in the case. So as Judge Ezra just recently ruled, no, at no point has the affidavits, the self-serving affidavits, been subject to any discovery, any cross-examination, since there was no other AUSA in this case. Moving on to the trial issue, the second issue, if I can briefly. Gold Clause contracts are not. That's error. There was no decision ever dealing with post-1982 Gold Clause contract statute 5118. I think maybe you can point me to language. I mean, the district court indicated in telling the jury of the law that for tax purposes, the gold was value, had to be acknowledged at fair market value. But I didn't see any specific statement saying a Gold Clause contract is unlawful. There were cited in the brief. I can, in my opening statement at EOR 531 as one example, I start out by saying a Gold Clause means a provision in or relating to an obligation, giving the obligee. That's just a fancy way that lawyers say the recipient a right to say, well, okay, I think it has to be made clear here that the issue for the jury is not whether what Mr. Carey did is legal under the law, okay? So at each point where we just raised the 5118. Where did the district court state a Gold Clause contract is illegal? At the record sites that we went through in terms of how it was set up. Then he commented on the documents, calling them chump rules, and then said, Mr. Kennedy, you know what chump rule is? And I said, yes. Analogized them to the Madoff, Bernie Madoff documents, went through drug ledgers. There's a statute that allows folks to do this contract legally. Now the tax consequences are a separate thing. But once you tell the jury that doing it, operating under a Gold Clause is illegal, you've directed a verdict in terms of sham. You've told them straight up. And then when you restrict and change the burden to the defendants having to testify to put in their defense, when you limit them from putting in 8033 contemporaneous statements that all came in in the first trial where the record is developed on those, when you then can't put in why it's reasonable to say, hey, Congress passed a Gold Clause contract. We've set up a Gold Clause. And it's reasonable that 35 businesses to the tune of $115 million in Las Vegas all believed what they were doing was... I thought your client took the gold back and gave them cash, employee's cash instead. And then actually used the Gold Clause contract, correct? She testified that her low was $63 silver at the lowest. And did the employees keep the gold? $625. They could. They had the option. She testified that... But the testimony was if they kept the gold, the fair market value of the gold was deducted from the cash in the envelopes that they were going to get. That was the testimony at trial. That was disputed by other testimony that said no. But the jury apparently believed the testimony of the people who said if they wanted to keep the gold, that amount was deducted from the cash. Well, I don't know. The jury could have believed many different scenarios at that point. But when we're looking at the jury verdict, we look at the evidence that supports the jury verdict. Correct. And in the first trial when we didn't have this attack on the defense case, no one was convicted in 162 counts. In the second trial when the evidence of reasonableness was limited, our ability to deal with this issue, not being able to call the accountants who had a master's degree in taxation, and when asked how to value this, they said they didn't know. We were not able to go in with an individual who brought the gold documents that he had in one hand and his other documents in the other to the IRS office in Las Vegas and said, help me out here. How do I account for that? And they said, we don't know. When that evidence is taken from the trial, then it becomes an unfair trial. I'll reserve the time. I'm sorry I took up more. But you had a third issue. Just mention what you said. There are three issues, and the third issue is in two parts. First, Congress, through the Gold Clause cases, the legal tender cases, and principally Thompson cases, Supreme Court case, Congress has the ability under the congressional constitutional provision here, Article 1, Section 5, I think it's Clause 8, Congress alone sets the value of a dollar. And all of those cases say a dollar is whatever Congress tells it to be. And so you cannot say that a payroll system, which is measured in United States money in a particular coin under Section 5118, in the gold eagle and the silver eagle, you cannot make that property when it's received by the recipient of it. And all of the cases, Kortner, CalFed, all of those cases all predate the congressional statute. And so under either a separation of powers or the rule of lenity, there was no IRS publication, court order, construction, nothing given to tell a taxpayer that money, which is money for many purposes, suddenly magically becomes property the moment it hits your hand. And the court ruled it didn't matter whether they received their pay, either in terms of Federal Reserve notes or in the coin, the fair market value of the result was the same. And so you cannot take that away from Congress. Thank you. Thank you, counsel. Counsel, we'll give you a couple of minutes to state your position. The Kerry, Mr. Robert Kerry's specific issues that I addressed in his brief are with regard to the sentencing determination and computation. One of the large issues pertinent to that was this application of these 35 other construction companies for which the amount that Mr. Kerry did their pay service was attributed to him for the loss amount. But wasn't that part of the scheme as alleged by the prosecution? It was part of the scheme as alleged by the prosecution to a small extent. But what the government never did was put on any proof from any of those 35 others, I call them, as to what their status was. We weren't able to get any discovery with regard to any of those. But why does it matter what their status was? Because we don't know if they paid taxes. They may very well have paid taxes. It doesn't matter if they paid taxes for purpose. Oh, you're saying for loss amount? Right. That they may have paid taxes on it. Right. And we couldn't get discovery on it. And it was a substantial amount. It also goes to the $16 million restoration. But who would you get discovery from on that issue? The IRS. Couldn't you go to the companies? Couldn't you go to the companies themselves? You weren't precluded from doing that to ask the companies if they paid taxes. Well, I can tell you that with regard to the largest one, Gil Dow, he wouldn't talk to us because he was afraid he was going to get indicted. None of these people were ever indicted. And if they paid taxes, they probably wouldn't have been indicted, wouldn't have been afraid that they were going to be indicted. I don't know. And now we're speculating, which they tell me in school not to do at the Ninth Circuit. Well, you're speculating about what you would get from discovery as well. The other issue I raised with regard to Mr. Carey was it had to do with the searches and the fact that, and he alleged from the start, this is well-developed in the record so I won't belabor it, that they were tantamount to general warrants and that there was no basis to seize the $230,000 from him at the time of arrest because all they had for him was a bench warrant that a state court charged him with. He's talking at the bank, right? Yes. Because the argument the government makes, or one of them, is that the issue was moot because Mr. Carey didn't identify any of the illegally seized items that were admitted into evidence. Is that incorrect in your view? I'm sorry. Can you say it again? They argue that your issue as to the money seized at the Bank of the West is a moot issue because it was never introduced into evidence at trial. Okay. It was not introduced into evidence at trial, but the government had no right to seize it. The other items that were seized were all returned. There was no legal due process issue as to what happened with that $230,000. And, frankly, as a matter of fact, So you object to the tax? It was applied, I understand, to the tax levy? Yes. Under Rule 31G? Mr. Carey needed it to pay his counsel. He, as we speak, owes Mr. Cohan over a million dollars and me over $60,000. So the money should have been used for him to be able to at least apply toward the amount that he owed counsel. I don't think the IRS gets to just decide that they're going to apply it first to taxes. And that was But the law does say that. Why? I think at some point they can, but not before there's been a conviction. I know that you've given me great latitude in going beyond. Does anyone have any other questions of me on the share issue? Judge, do you have any questions? No. Okay. Thank you. Thank you, counsel. We'll hear from the government. Good morning, Your Honors. Mark Detterman, United States Department of Justice, Tax Division for the United States. Were you trial counsel? No, I was not. But I will point out to one of your questions, Tax Division reviewed the prosecution and approved the prosecution in this case. A Tax Division attorney was first chair in the first trial and was second chair in the second trial. So this is a case where Defendant Robert Carey paid out over $120 million in wages to his employees and the employees of 35 other contractors. In fact, the Loomis Armed Car Company said that the Careys were the biggest user of cash in Las Vegas other than major banks and casinos. No Social Security, no Medicare, and no income tax were paid out of these salaries. And a good portion of that went into Mr. Carey's pocket. So the main point that they're raising on appeal is the conflict of interest alleged with the prosecutor, Mr. Dam. Yes. And he was being sued and it survived a qualified immunity argument. Why doesn't the rule in Young v. Vuitton apply to say there's a structural or at least appearance of impropriety? He could use the underlying criminal case to assist him in the civil suit. Well, first let me say that Vuitton is distinguishable here. Vuitton was a case of a private attorney that had a conflict and that private attorney was appointed by the court to act as a prosecutor against the defendant that he was in civil litigation with. And so there was a clear pecuniary interest of the lawyer in that case. And the second thing about that case is that it was a court's inherent power case. It wasn't a constitutional case. And so the court was looking at the court's inherent power to appoint a prosecutor, which is different from in this case where you have a prosecutor that's an executive, a branch official, not a private attorney appointed to do a prosecution. Finally, the third thing about Vuitton is that Vuitton's... How does that make a difference? How does it make a difference that it was appointed, that the prosecutor was appointed by the court in Vuitton and by the executive branch official here? Well, first in the Supreme Court in Vuitton emphasizes the fact that it was a court-appointed prosecutor versus here where we have an executive branch prosecutor. Again, the executive branch prosecutor, this is his job, is to prosecute these cases. He's supervised by a U.S. attorney. He's also supervised by the main justice, unlike a private attorney who doesn't have that supervision. So if a prosecutor had been sued, say outside of their work as a prosecutor, and then as a prosecutor they brought a criminal action against the same individual, how should we analyze that sort of situation? That wasn't the situation here, but there's a potential that that could occur. Well, if there was actually some type of civil suit that was very separate, I mean, that would raise more red flags. But I believe that what happened in this case is exactly what we want to happen, and that is that a district court looked at all the evidence. He looked at the allegations in the Bivens suit. He looked at the prosecutor's conduct over this case and determined whether there was a reason to remove the prosecutor. And that is reviewed by this court on an abuse of discretion standard. And I believe that that's actually we had two district judges who looked at this. And the second one, Judge Ezra, was brought in from out of district. So I'm What standard should we use to evaluate this sort of claim that there's a Well, according to the cases, for example, Lorenzo and Kember, it has to be clear and convincing evidence of misconduct or a conflict of interest. The counsel pointed out that Kember was a plain error case. Does that make a difference in terms of how we analyze it? Well, I believe, well, no, Your Honor, because I think both Kember and another Lorenzo both generally state that that's the standard, that clear and convincing evidence of misconduct or a clear conflict of interest is the standard. And is that misconduct in the case that the prosecutor is being sued by the defendant or is it misconduct in the case, the criminal case against the defendant? I think it can be either. It can be clear and convincing evidence of misconduct in either case. And so your position is there was no evidence of misconduct either in the Bivens case or in this prosecution. Is that correct? Well, there is not clear and convincing evidence of misconduct. There is an allegation in the Bivens case. And the allegation that survives is that the AUSA in this case directed an illegal raid, that is an allegation. The AUSA admits that he was within, he was in the process, that he was one of the people that reviewed the search warrants. He was not present at the time the search warrants were executed. He wasn't in on the meeting with a special strike force that executed the search warrant. But he has admitted that he was within the review process. He was part of the review process, one of the attorneys that looked at the search warrant. He wasn't the attorney that signed off on the search warrant, as far as I know. I believe that's correct. But he admits that he was in this review process. And the allegation in the Bivens case is that he planned an illegal raid. And to give you a status on the Bivens case, I believe the only surviving claim at this point in the Bivens case is the search of Lori Carey's residence. And her residence was within the property of one of the search warrants, but wasn't named in the search warrant. And the officers of the strike force did a protective search, but the district court found that that protective sweep went beyond the scope of a protective sweep. And said that the materials found during that protective sweep could not be, you know, suppress those materials found in it. If no one else has any questions about the conflict, I'd like for you to discuss the gold contracts issue that counsel raised, and specifically the argument that when the information was allowed to be presented to the first trial, in the first trial there were no convictions. And when the judge prevented that information from being presented to the jury in the second trial, there were convictions. Well, I think that overstates what actually happened. It's possible you could say this judge was a little bit more strict on those issues, but a large amount of this evidence came in. He's talking about third parties. He wants in evidence of third parties testifying what the defendants told them about the defendants' beliefs. Did that come in at the first trial? There was evidence similar to that that came in in the first trial, but it also came in, and a large amount of it, and it's in our brief, came in during the second trial. Where the judge, and the judge specifically said, and we again cite that in our brief, I'll have to find the citation for you, where the judge specifically said that that type of evidence can come in, but he had a lot of concerns about having too much coming in, basically allowing defendants to testify through third parties, and also that it was not very reliable. In fact, I mean, this court, the case is Syocum, I believe, said that a statement of someone's belief entered to prove the truth of that belief is inadmissible hearsay. And that was in the same type of case as this, a statement that I believe I'm not committing a crime in order to prove that the person believes they're not committing a crime. This circuit has said that that is inadmissible hearsay. What about the gold contracts clause in and of itself as being, defeating the IRS's description of the gold coins as representing fair market value as opposed to the face value of the coins? Yes. Well, first, let me address one thing that defense counsel brought up, and that's the court's instructions. And I have in our brief here, it's on page 46 of our brief, that the court specifically instructed the jury that gold and silver coins may be used as money to pay debts at the dollar value listed on the face of the coin. And so the jury had to find that that did not happen here in order to convict the defendants. Again, the tax law is clear that when a monetary instrument has a much greater value than the monetary amount, and this can be an old dollar, say a Civil War dollar, may be worth thousands of dollars. But, again, for tax purposes, it's going to be worth the fair market value of the monetary instrument. The fact that- Can you try to make a distinction based on these coins that are currently in circulation, whereas the precedent the government relies on, the court does make a point of saying those coins are out of circulation. How does that make a difference, if at all? Well, he's correct that the two Ninth Circuit cases that we cite, Cordner and California Federal, are both cases in which the coins were no longer in circulation. And both those cases said that the gold coins were valued at their fair market value. But we also cite out-of-circuit cases, the Tenth and Eleventh Circuit, which have both said that circulating coins also are taxable at their fair market value. And there's also a tax court case that is obviously not binding on this court, which is exactly on point that says these coins are taxed at their fair market value. And, again, I think it's interesting that counsel chides the judge for saying that there was a loophole that Congress created where you could avoid taxes by paying in gold coins. And defense counsel has said, well, that's a remark that the judge made that is prejudicial to our defendants. But here that's exactly what they're arguing. They're arguing that somehow by creating these gold coins that Congress has created a tax loophole. And that's just not the case. There's no cases that say there's a loophole. And the fact that the coins have a monetary value that they legal tender value at, say, $50 a coin, doesn't mean that their tax value isn't a much greater amount. For example, a treasury that currently sells these coins that are circulating sells them at their fair market value. They don't sell them for $50 apiece. What's your response to counsel for Robert Carey's objection to the seizure of the money at the bank? And the allegation that there was a lack of due process? I set forth in our brief that the IRS seized that under a valid levy, IRS levy. That was before Carey filed his motion, his 41-F motion for return of the money. This court, and I can't, I'm sorry, I can't quote the name of the case, but there's a Ninth Circuit case on point that says that the IRS levy defeats Rule 41 motion for return of seized property. And that's the sum of our position. And again, that went toward Mr. Carey's tax liability, which this court through restitution has ordered him to pay, so it lowers his restitution amount. And what's your position regarding the argument that there was no showing that the loss attributable to the other companies was sufficiently proved? Well, as this court pointed out to defense counsel, it was specifically charged, that was one of the charges of the 371 Klein Conspiracy Count, was to defraud the government through assisting these other contractors in evading the payment of employment taxes. So it's specifically charged. And there is plenty of tax law that you can assist someone else in evading their taxes and you can be charged with it. It doesn't have to be taxes you owe. As long as someone owes that taxes and you're assisting them in evading it, and the jury found in this case that that's what happened, you can be found guilty of evading another's taxes, and that would be relevant conduct. Well, it would actually be more than relevant conduct. It would be direct conduct that was charged in the indictment and would be part of the tax loss. So was the prosecution theory that because Mr. Cary was administering those payroll systems, that it would have been his responsibility to take out the taxes, the employment taxes and the other taxes? That is the main theory, but we also have the backup theory, is that he was helping others evade their taxes by hiding the whole method of payment and paying them in cash. And so his intent was to help others evade the payment of those taxes. So either he was responsible or other people were responsible, but in either way he was assisting and his intent was to evade the taxes. Was there evidence in the record that no taxes were paid that were due from those companies? Was that evidence presented? I don't remember if it was in the record or not. Do you? I believe, well, during sentencing the government bought estimates of the amount of taxes that were due. There were some individuals from those other companies that actually did file tax returns and paid their taxes, but it was a small number, if I remember correctly, who actually paid their taxes. But again, the government at sentencing entered the evidence of the amounts of the tax loss from the 35 other contractors. Fifty-five million, wasn't it? I'm sorry? Fifty-five million? Fifty-five million? Yes, Your Honor. Yeah, the tax loss was approximately $55 million. And Mr. Carey made about $12 million over the course of the scheme, and that was his personal income based on our calculations. Any other questions? Any final comments, counsel? No. Not if you don't have any other questions. Thank you. Thank you. Mr. Kennedy, we'll give you two minutes for rebuttal. With respect to the instruction issue, the instruction issue took away any difference in terms of the jury deciding because the instruction told them it didn't matter. At the moment they were paid with gold and silver coin, it became property valued at the fair market value at the moment it hit their hand. So it took away the jury determination on that. It would have been more proper to have the jury decide were they following a legal payment system or was the pay cash, and they took that away. Second, in terms of the prejudice at trial, in the first trial we had testimony from various people as to contemporaneous statements made by Lori Carey and others as to their beliefs. That was precluded in the second trial. In the first trial, Lori Carey, I defended that case without calling her as a witness. In the second trial, it was made an obligation that she have to testify to present a defense because it could only come through her own statements at trial, which of course you'd want to show that she said the same things four or five or six years before to others. That was precluded. At the first trial, we had testimony from a person who had a master's degree in taxation who said he didn't know how to value payment in gold and silver coin, which went directly to whether there was a duty to value it as property, knowledge of that duty, and an intentional disregard of that duty. There was testimony from people from the 35 companies that they went to the IRS afterwards to try to figure out how to value it, and the IRS said they didn't know. There were documents from the IRS that said you needed to value this on the face value. Ms. King from the IRS, that was in the evidence. With respect to the Howard memo, which is part of the issue that we're asking for judicial notice, the IRS is hypocrisy here because if you pay with the $50 coin, they credit your taxes with $50. Counsel said they sell the rest of it, then they keep it, and they don't credit it to the taxpayer. That's a crazy system to base a criminal case, and that's precisely why IRS agent Mercedes Manser looked into $25 million in the initial investigation, a 20-year IRS agent. She received all of Mr. Carey's beliefs in this regard, and she discontinued the criminal investigation and said this should be pursued civilly. Then Mr. Dam and Mr. Halper got on the case, and they went the criminal route. Thank you. All right, thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. This completes our calendar for the morning. This court is in recess until 9 o'clock a.m. tomorrow morning. All right. No. No. Can't move until it's cold. Okay.
judges: Hug, Rawlinson, Ikuta